Mangrum v. State.

4856                                    299 S. W. 2d 80

Opinion delivered February 18, 1957.

[Rehearing denied March 18, 1957.]

*McCourtney, Brinton, Gibbons & Segars,* for appellant.

*Tom Gentry,* Attorney General, and *Roy Finch, Jr.,* Assistant Attorney General, for appellee.

Ed. F. McFaddin, Associate Justice. Appellant, Clyde Mangrum, was convicted of the crime of sodomy (§ 41-813 Ark. Stats.) ; and prosecutes this appeal. The motion for new trial contains twenty-three assignments which we group and discuss in topic headings.

I. *Sufficiency Of The Evidence.* The act of sodomy charged by the information in this case was, "unnatural sexual relations with Edward Brasshire, another male, being aged 9 years old, by forceably placing his sex organ in the mouth of said child." Such information charged an offense denounced by § 41-813 Ark. Stats. See *Woolford* v. *State,* 202 Ark. 1010, 155 S. W. 2d 339;

*Havens* v. *State,* 217 Ark. 153, 228 S. W. 2d 1003; and *Hummel* v. *State,* 210 Ark. 471, 196 S. W. 2d 594.

The testimony of Edward Brasshire (hereinafter referred to as "the boy") was: that he was at the home of Mr. Harbin, along with Mangrum, Byrd Ashburn (the boy's uncle), and several other people; that Mangrum lured the boy to a place in the back yard behind the chicken-house, and there committed the filthy act, as charged in the information. Byrd Ashburn, the boy's uncle, testified that when he went in search of the boy he saw the entire performance. The testimony of either the boy *or* his uncle was sufficient to take the case to the jury. Giving the testimony of the State its full force and effect, as we do on appeal in cases like this one[1], the evidence is sufficient to support the verdict.

II. *Competency Of The Boy To Testify.* The boy was blind and only nine years old; and appellant urges that the Trial Court failed and refused to make sufficient interrogation of the boy before allowing him to testify on original examination. Appellant relies most strongly on some of our language in *Crosby* v. *State,* 93 Ark. 156, 124 S. W. 781, 137 Am. St. Rep. 80, reading as follows:

"In the present case we do not think the examination of the witness by the circuit judge was sufficiently comprehensive. The child must not only have intelligence enough to understand what he is called upon to testify about, and the capacity to tell what he knows, but he must also have a due sense of the obligation of an oath, by which is meant, as we deduce from the authorities, *supra,* that the promise to tell the truth must be made under 'an immediate sense of the witness' responsibility to God, and with a conscientious sense of the wickedness of falsehood.' "

Our cases recognize that the determination of the competency of a child, of such years as the one here involved, to testify at all is a question for decision by the Trial Judge. In *Paxton* v. *State,* 114 Ark. 393, 170 S. W. 80, we said:

---

[1] See *Allgood* v. *State,* 206 Ark. 699, 177 S. W. 2d 928, and cases there cited.

"It is the province of the judge to pass upon any question involving the competency of the witness and the admissibility of the evidence offered; . . ."

We have many times reaffirmed what we said in the early case of *Flanagin* v. *State,* 25 Ark. 92:

"As to children, there is no precise age within which they are absolutely excluded, or the presumption that they have not sufficient understanding. At the age of 14 all persons are presumed to have common discretion and understanding, until the contrary appears; but under that age it is not presumed; hence inquiry should be made as to the degree of understanding which the child, offered as a witness, possesses; and, if he appears to have sufficient natural intelligence, and to have been so instructed as to comprehend the nature and effect of an oath, he should be permitted to testify, no matter what his age may be."

The questions asked the boy by the Court — to determine his competency as a witness — consumed two pages in the transcript. At the conclusion of such examination, the Court held that the boy was competent to testify — adding, of course, that the *credibility* of the boy's testimony was entirely a matter for the jury to decide. We hold that the Court ruled correctly in the matter of the competency of the boy as a witness. Here is the Court's summary:

"This witness has stated he believes in God and he has stated that it is wrong to tell a lie and he has further stated, when asked what would happen to him if he told a lie, that he would be in serious trouble. He stated the Bible has been read to him and his answers have been clear and concise other than he has had a little difficulty in hearing. He has demonstrated to the court that he has an intelligent appreciation of the English language for a child of his age."

III. *Refusal Of The Court To Allow The Witness, Russell Baxter, To Testify As To The Competency Of The Boy As A Witness.* When the State first offered the boy as a witness, the appellant not only (a) objected

as to his competency, as shown in Topic II, *supra,* but also (b) sought permission to call Russell Baxter to testify against the competency of the boy. This request was refused; and then later, after the State had rested its case in chief, the appellant again sought to call Russell Baxter to testify to the boy's competency as a witness. This request was also refused. Appellant saved his exceptions to each adverse ruling and in the proper manner has brought into the record the offered and refused testimony of Russell Baxter on the boy's competency. Here is a summary of the proffered testimony: Mr. Baxter is a Counsellor of Vocational Rehabilitation for the Blind, where the boy has been a pupil. In the early part of 1956, Mr. Baxter had occasion, in his official duties, to give intelligence tests to the boy. Such counselling continued for some time and in the course of it, Mr. Baxter tested the boy by the Wexler Intelligence Scale for Children, which Mr. Baxter says is an accepted test for handicapped children. Under this test a grade of 69 and below shows a mental defective; from 70 to 79 is a borderline case; from 80 to 89 is dull normal; and from 90 to 100 is normal. Mr. Baxter says that in this test the boy made 70, which is above the mental defective range, but is a "borderline case." From the Wexler test and from Mr. Baxter's personal observation of the boy, Mr. Baxter gave as his professional opinion regarding the mental status of the boy:

"He is easily dominated, highly over-protected by those close to him. If this person is close enough to him, he could be made to believe (anything told him by such person) . . . He doesn't think fast, because of this emotional immaturity. He doesn't think fast because of a low intelligence quotient sometimes mistaken for hard of hearing . . . I feel that Eddie cannot give a comprehensive detailed description of any eight hour period regardless of lapse of time involved without a certain amount of instruction . . ."

Appellant most earnestly insists that the Court committed error in refusing to allow the jury to hear the foregoing testimony of Russell Baxter; and appellant

cites *Thrash* v. *State,* 146 Ark. 547, 226 S. W. 130; and *Mell* v. *State,* 133 Ark. 197, 202 S. W. 33. In the last cited case, we said of a witness who had testified for the State and against whom offered testimony as to mental competency was rejected:

"It is not contended by the defendant that the prosecuting witness was mentally incompetent to testify in the case. His contention was that she was subject to insane delusions at times and it was admissible, in order to affect her credibility as a witness and to explain her conduct, to prove this fact by witnesses who had personal knowledge of her condition of mind or mental delusions as well as by her acts and conduct on the occasion in question."

We understand that the *insanity* or the *mental delusions* of a witness may be shown by the testimony of another witness. But that is not the situation in the case at bar: here it is not claimed that the boy was insane or suffered mental delusions — it is only claimed that he was dull of comprehension and could be easily imposed on. The Court asked the witness, Baxter, as to the insanity of the boy:

"Court: Do you say Edward is insane? A. No, sir, not at all."

And the Trial Court in its ruling summed up the entire situation as follows:

". . . it appears to me that the nine year old blind boy made a very bright witness. You have asked highly technical questions here with regard to whether these things could have been suggested or not. The undisputed evidence shows here that the nine year old boy was taken immediately to an officer and shortly thereafter repeated this story to the Constable and deputy Sheriff shortly after the occurrence of it. If there is no contention here that this witness is insane, then the court does not believe this testimony is competent. If you could introduce testimony of this type, you could introduce it with reference to any person . . . I believe the credibility of the witness is entirely a matter for the

jury, and I think the nine year old boy has demonstrated that he is aware, he believes in God, he is taught the Bible regularly, and that he is aware he must tell the truth.''

The cases and the textbook writers are sharply divided on this matter of offering testimony to impeach a witness on the basis of low mentality. To review all of the authorities would constitute a treatise. In *Isler* v. *Dewey* (1876), 75 N. C. 466, the Supreme Court of North Carolina held that it was proper to allow one witness — a layman — to testify that an opposing witness has a memory ''below medium.'' Again, in the later case of *State* v. *Armstrong* (1950), 232 N. C. 727, 62 S. E. 2d 50, a doctor was not allowed to testify to the jury concerning a witness: ''I would classify her as a low class moron, equivalent of a nine-year-old child.'' The North Carolina Court held such evidence should have gone to the jury, saying:

''What could be more effective for the purpose than to impeach the mentality or the intellectual grasp of the witness? If his interest, bias, indelicate way of life, insobriety and general bad reputation in the community may be shown as bearing upon his unworthiness of belief, why not his imbecility, want of understanding, or moronic comprehension, which go more directly to the point?''

Many courts hold directly opposite from the holdings above mentioned. In *Bell* v. *Rinner* (1864), 16 Ohio State 45, the Ohio Supreme Court held that it was reversible error to permit witnesses to testify of an opposing witness, that she was not of ordinary intelligence. The Ohio Supreme Court said:

''The question presented by the record is, whether the credibility of a competent witness may be impeached by general evidence that the witness is not possessed of ordinary intelligence or powers of mind. It would not only be novel in practice, but would be entirely impracticable, to permit the parties, on the trial of a case, to go into general proof as to the strength of the mental capacity of the several witnesses. It might

lead to as many collateral issues as there are witnesses, and thus divert the minds of the triers from the substantial issues of the case. Litigation would become more uncertain and interminable than ever. Moreover, if it be conceded that the credibility of a witness is to be graded in proportion to his strength of intellect, the tribunal before which he testifies can better estimate his capacity, and the weight to which his testimony is entitled, by his manner, and by his statements on cross-examination, than can, ordinarily, be done by the testimony and conflicting opinions of other witnesses, as to the extent of his mental powers, or the degree of his intelligence.''

The Supreme Court of Colorado, in *Blanchard* v. *People* (1922), 70 Colo. 555, 203 Pac. 662, followed the holding of the Ohio Court. Witnesses were allowed to say of opposing witness that he was of a ''low order of intelligence.'' In holding the admission of such testimony to be reversible error, the Colorado Court said:

''Men differ in grades of intelligence as blades of grass in appearance. The utter unreliability of such testimony is at once apparent, when we remember that every man's opinion of the intelligence of others is largely controlled by the quality of his own. To his neighbors John Smith may have seemed a man of average intelligence, though Herbert Spencer may have deemed him a fool.''

In Wigmore on ''Evidence,'' 3rd Ed. Vol. 3, § 935, the arguments are listed on this question of admissibility of evidence to dispute competency; and cases are cited to sustain each side[2]. Also in McCormick on ''Evidence,'' page 97, *et seq.,* this matter is discussed:

''Manifestly, however, the fact of insanity or mental 'abnormality' either at the time of observing the facts or at the time of testifying will be provable, on cross or by extrinsic evidence, as bearing on credibility. What of defects of mind within the range of normality, such as

---

[2] See also Annotation in 15 A. L. R. 932: ''Impeachment of witness by expert evidence tending to show mental or moral defects.''

a slower than average mind or a poorer than ususal memory? These qualities reveal themselves in a testing cross-examination by a skilled questioner. May they be proved by other witnesses? The decisions are divided. It seems eminently a case for discretion. The trial judge would determine whether the crucial character of the testimony attacked and the evaluative light shed by the impeaching evidence over-balance the time and distraction involved in opening this side-dispute.''

Without further laboring the point, we think our own case of *Criglow* v. *State,* 183 Ark. 407, 36 S. W. 2d 400, indicates the course that our holding should take in the case at bar. In the Criglow case, Judge Frank G. Smith stated the issue and the holding in this language:

''E. E. Brooks was called as an expert by appellant, and a hypothetical question was submitted upon which his opinion was asked. This question would have called for the opinion of the witness as to the powers of observation and recollection of Allen and Jones in the matter of their identification of appellant as one of the robbers, they never having seen him prior to the robbery. The court properly excluded this testimony. There was no contention that these witnesses were of unsound mind. It was, of course, proper to inquire how badly the witnesses themselves were frightened by the robbery, and this information might have been elicited by the examination of the witnesses themselves on that subject. It would not have been improper to have asked other witnesses present what opportunity Allen and Jones had to observe the robbers, also what their conduct was during the robbery. But the question whether these witnesses were mistaken in their identification, whether from fright or other cause, was one which the jury, and not an expert witness, should answer. This was a question upon which one man as well as another might form an opinion, and the function of passing upon the credibility and weight of testimony could not be taken from the jury. *Dickerson* v. *State,* 121 Ark. 564, 181 S. W. 920; *Mitchell* v. *Lindley,* 148 Ark. 37, 228 S. W. 728.''

We agree that evidence may be offered to the jury regarding the *insanity* of a witness or *mental delusions* that a witness may suffer. This is because a witness may testify ever so brilliantly to the jury, and yet his insanity or mental delusions may not appear. But, when we come to the question of whether a witness has low mental comprehension — absent, as here, any claim of insanity or mental delusions — it seems that the trial judge should have discretion to decide whether the trial should be prolonged by calling witnesses to give their opinions to the jury, or whether the matter is sufficiently clear for the jury to intelligently determine credibility without the trial being prolonged by such testimony as to the mental comprehension of another witness. We hold that the trial judge has discretion in this matter; and we cannot say that he abused his discretion in the case at bar.

IV. *Other Assignments.* We have examined all the other assignments urged by the appellant and find none to constitute reversible error.

Affirmed.